# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:24-cr-40 |
| | ) | |
| v. | ) | Sentencing Date: January 16, 2025 |
| | ) | |
| CRAIG DAVID DAVIS, | ) | The Honorable Patricia Tolliver Giles |
| | ) | |
| *Defendant*. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The defendant, Craig Davis ("Davis" or the "defendant") defrauded multiple government pandemic relief programs during the backdrop of the COVID-19 pandemic, an unprecedented time of financial hardship, turmoil, and suffering, and caused nearly $10 million of loss. Specifically, the defendant submitted multiple Paycheck Protection Program ("PPP") and Main Street Lending Program ("MSLP") loan applications to which he was not entitled. Simultaneously the defendant continued to execute another long-term fraud scheme that caused at least 15 banks to issue over *$60 million* across *359* fraudulent loans. The United States of America, through undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), files its sentencing recommendation.

The Presentence Investigation Report ("PSR") calculated Davis's total offense level as 30 and his criminal history as category II, resulting in an advisory Guidelines range of 108–135 months. The United States agrees with the PSR's Guideline calculations. For the reasons set forth below and in the accompanying sealed filing, the United States respectfully requests that the defendant be sentenced to a term of imprisonment of 97 months, which is below his Guideline range. The United States also requests that the Court sentence the defendant to three years of

supervised release, and consistent with the plea agreement enter a proposed forfeiture order for $8,995,191.55 and order restitution in the amount of at least $8,995,191.55.

I.  **BACKGROUND**

   **A. The Pandemic**

The pandemic was a time characterized not only by a serious disease but also by true economic uncertainty. The fear felt at the time is hard to remember now – there were concerns about the country falling into an economic depression during the first few months of the pandemic. Millions of Americans lost their jobs seemingly overnight. 23.1 million Americans were unemployed in April 2020.[1] The U.S. real gross domestic product (GDP) "fell by 8.9 percent in the second quarter of 2020 … the largest single-quarter contraction in more than 70 years." [2]

In response to the looming financial peril threatening the country, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES Act," in March of 2020. The CARES Act made billions of government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program. These loans would be forgiven entirely if the loan proceeds were used on a narrow list of expenses designed to help struggling businesses survive such as payroll, utilities, rent, and employee health care expenses. PSR ¶ 24. To qualify for a PPP loan, an applicant had to meet certain criteria designed to ensure

---

[1] "TED: Economics Daily," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm (last visited September 1 2023)

[2] "The U.S. Economy and the Global Pandemic, Chapter 3," the White House (April 26, 2022, 4:00 p.m.) available at whitehouse.gov/wp-content/uploads/2022/04/Chapter-3-new.pdf (last visited September 1, 2023)

that the program's assets would be used to forestall widespread layoffs and economic collapse.

The CARES Act also authorized the Main Street Lending Program ("MSLP"). The MSLP was an emergency lending program established by the Federal Reserve Board ("FRB") and administered by the Federal Reserve Bank of Boston ("FRBB"). PSR ¶ 25. The MSLP was designed to support lending to small and medium-sized businesses that were in sound financial condition before the onset of the COVID-19 pandemic. *Id.*

MSLP applicants, through their representatives, applied for their loans with private lenders, such as banks, that had been approved by the FRBB for making MSLP loans. PSR ¶ 26. The borrowers had to meet the eligibility requirements set by the MSLP and certify that they would abide by the terms of the program and additional criteria set by the private lenders. *Id.* The MSLP and the lenders required applicants to submit accurate financial information to support their applications. *Id.* The MSLP and the lenders also required that the loan proceeds be used for business expenses, and the lenders often required more specific representations by the representatives of the businesses. *Id.* Lenders relied on the accuracy of the information contained in the loan applications and supporting documents. *Id.*

When a lender decided that an applicant had met the requirements of the MSLP and the lender, the lender sent information about the borrower and the requested loan amount electronically to MS Facilities. PSR ¶ 27. Once a loan had been approved, MS Facilities sent the lender a commitment letter stating, among other things, that MS Facilities would purchase 95 percent of the loan. *Id.* The lender kept five percent of the loan and was responsible for servicing the loan. *Id.* The MSLP deferred interest repayments until the second year of each loan, the first repayment of principal until the third year of each loan, and the final repayment of principal until

the fifth year of each loan. *Id.* All MSLP loans were made between July 2020 and January 2021 and were not forgivable. *Id.*

### B. Offense Conduct

From at least April 2020 through at least February 2021, Davis engaged in a scheme to defraud CARES Acts Program of nearly $10 million by fraudulently applying for multiple PPP loans and one MSLP loan that he knew neither he nor his business, Bright Vanguard, LLC ("BV"), was entitled to receive. PSR ¶¶ 29-33. He created fake payroll records, fake tax documents, and fake business records to support the fraudulent loan applications. PSR ¶¶ 31, 38, 42, 45-46, 50. Notably, the defendant even took pains to create not one, but *two* fake financial audit reports to support his MSLP loan application. PSR ¶ 50.

Simultaneous to this conduct, he engaged in a years' long scheme to defraud commercial equipment lenders by soliciting business owners to submit fake invoices for computer equipment from his company, BV. PSR ¶ 52. In that scheme, the defendant recruited business owners in need of operating capital to apply for commercial equipment loans. The defendant provided the applicant borrowers invoices from BV, or other companies he controlled through proxies, falsely indicating the sale of computer equipment. *Id.* The borrowers provided these invoices to lenders to justify their loan requests. Once approved, the lenders provided the defendant with the funds. The defendant then remitted the majority of the loan proceeds to the borrowers and kept approximately 10 to 25% of the loan proceeds for himself and his coconspirators without providing the equipment indicated on the invoices. PSR ¶ 54. This kick-back scheme was never disclosed to the lenders. The defendant's scheme involved approximately 359 separate loans to dozens of financial institutions, resulting in nearly $60 million of fraudulently induced lending. PSR ¶ 55.

## II. GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 200, 264 (2005); *see also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation marks omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the defendant's guideline range after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the [G]uidelines and those factors set forth in [18 U.S.C. §] 3553(a) before imposing the sentence." *Id.*

   a. The Advisory Guideline Range

The parties agree to the base offense level, the 20-level enhancement based on the loss from the COVID-19 relief fraud scheme, the 2-level enhancement for the offense involving 10 or more victims, and the 2-level enhancement for deriving more than $1,000,000 from a financial institution are not in contention. PSR ¶ 5, ECF No. 38 at 3.

| Guideline(s) | Description | Offense Level |
|---|---|---|
| 2B1.1(a)(1) | Base offense level | 7 |
| 2B1.1(b)(1)(K) | Loss amount was greater than $9,500,000 but less than $25,000,000 | +20 |
| 2B1.1(b)(2)(A)(i) | Offense involved 10 or more victims | +2 |
| 2B1.1(b)(2)(17) | Defendant derived $1,000,000 or more from one or more financial institutions | +2 |

The PSR offense level calculation includes an additional enhancement, the 2-level enhancement because the offense involved sophisticated means, *see* PSR ¶ 89, U.S.S.G. § 2B1.1(b)(10)(C). The plea agreement explicitly reserves the right for the parties to argue their position regarding the sophisticated means enhancement. ECF No. 38 at 3.

      i. <u>Sophisticated Means Enhancement</u>

The PSR correctly includes a 2-level enhancement for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C). "For purposes of subsection (b)(]10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. 2B1.1 cmt. n.9(B); *see also Stinson v. United States*, 508 U.S. 36, 38, 113 (1993) (holding that Guidelines commentary explaining or interpreting a rule "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"). The sophisticated means enhancement "applies where the entirety of the scheme constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). The

6

enhancement applies even if the defendant did "not utilize the most complex means possible to conceal his fraudulent activities[.]" *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012).

The defendant admitted in his written allocution that "BV did little if any legitimate business and Davis used it primarily as a vehicle to commit the offenses detailed herein." PSR ¶ 28. As such, BV should be viewed as a corporate shell—one of the specific examples set forth in the Guidelines justifying the application of the sophisticated means enhancement. *See United States v. Igboda*, 964 F.3d 501, 511 (6th Cir. 2020) (applying sophisticated means enhancement where defendant "used corporate entities in furtherance of his criminal activities") (quoting *United States v. Benchick*, 725 F. App'x 361, 369 (6th Cir. 2018)); *see also United States v. Rubashkin*, 718 F.Supp.2d 953, 976 (N.D. Iowa, June 21, 2010) ("A shell corporation is a company that is incorporated, but has no significant assets or operations") (quoting *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 737 (7th Cir. 2008)). Other aspects of the defendant's confirm the sophisticated nature of the offense. These include the defendant's use of fraudulent documents, including false tax documents, to misrepresent the extent of his business. *See United States v. Okolo*, 82 F. App'x 834, 837-38 (4th Cir. 2003) (affirming district court's application of sophisticated means enhancement based, *inter alia*, on the use of false documents); *see also United States v. Pierce*, 643 F. App'x 500, 502-04 (6th Cir. 2016) (affirming application of sophisticated means enhancement based, *inter alia*, on use of false tax returns and applying totality approach to analysis of offense conduct).

Consequently, the defendant's use of corporate shells and false documents, when considered in the broader context of his offense, counsels in favor of the enhancement's application and the adoption of the sentencing range set forth in the PSR.

## III. THE FACTORS SET FORTH IN SECTION 3553(A) AND RECOMMENDED SENTENCE

After calculating the appropriate Guidelines range, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006), *overruled on other grounds*. Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

### A. The Nature, Circumstances, and Seriousness of the Offense

Davis took advantage of a time of unprecedented uncertainty when and defrauded two different pandemic relief programs. He caused nearly $10 million in actual losses. If that was all he did, the defendant's conduct would call for a significant custodial sentence. However, the defendant's false invoice scheme also took place over several years, was prolific in scope, and caused approximately $60 million of fraudulent lending.

In fashioning an appropriate sentence, the Court should consider the length and severity of

8

the defendant's fraudulent activities—as indicated by his admission to the fake invoice scheme—and the fact that he took advantage of a nation emergency to enrich himself through fraud. *See Gall*, 522 U.S. at 59 (holding it was "quite reasonabl[e]" for the sentencing for the sentencing court to have "attached great weight" to a 3553(a) factor.); *see also Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (holding that appellate court should not find the sentencing court's reliance on a single factor unreasonable, so long as the court imposes a sentence sufficient, but not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)") (internal quotation marks omitted); *see also United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007) (permitting a district court to "reasonably accord significant weight to a single sentencing factor in fashioning its sentence.")

A sentence of 97 months would account for the seriousness of the defendant's crimes, provide just punishment, and promote respect for the law.

**B. The Defendant's History and Characteristics and the Need for Specific Deterrence**

The Court should also consider the fact that that defendant attended college (although he did not graduate) and had a history of steady employment before embarking on these fraud schemes. PSR ¶ ¶ 111, 119-120, 122. This demonstrates the role greed played in driving his conduct and this Court's need to deter any future misconduct.

The defendant also has a criminal history. In 2016, he was arrested after he attempted to open a bank account using an altered identification. PSR ¶ 100. He received a non-custodial sentence in exchange of a plea of *no lo contendere*. This further demonstrates the need for this Court to impose the government's recommended sentence because the defendant was not deterred when granted leniency. Rather, his conduct escalated significantly.

### C. Need to Deter Future Criminal Conduct and Promote Respect for the Law

The defendant exploited governmental efforts to aid those in need, for his own financial gain. His actions are serious, and their impact extends beyond this case. Each time federal benefits are obtained through fraud it misappropriates taxpayer dollars and shakes public confidence in government. His conduct demonstrates a disregard for the law and a failure to appreciate the purpose of pandemic relief loans.

Due to the prevalence of government program fraud, the United States often lacks the resources to investigate and prosecute all bad actors. Accordingly, general deterrence is critically important to dissuading others from engaging in similar conduct. *See United States v. Morgan*, 635 F. App'x. 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

Congress recognized that general deterrence is particularly important in the context of white-collar crime and "emphasized the critical deterrent value of imprisoning serious white-collar criminals, even when the criminals might be unlikely to commit another offense." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018); *see also United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) (cleaned up) ("[I]n enacting § 3553, Congress was especially concerned that prior to the Sentencing Guidelines, major white-collar criminal often were sentence to small fines and little or no imprisonment.")

## IV. CONCLUSION

A sentence of 97 months' imprisonment is sufficient but not greater than necessary to account for the defendant's wrongdoing. The government, therefore, urges the Court to impose the recommended sentence.

Jessica D. Aber
United States Attorney

*/s/ Kathleen E. Robeson*
Kathleen E. Robeson
Assistant United States Attorney

David A. Peters
Trial Attorney, Criminal Division,
Fraud Section, Department of Justice

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 9, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to all counsel of record.

By:
      */s/ Kathleen E. Robeson*
      Kathleen E. Robeson
      Assistant United States Attorney
      United States Attorney's Office
      Justin W. Williams U.S. Attorney's Building
      2100 Jamieson Avenue
      Alexandria, VA 22314
      Telephone: 703-299-3700
      Email: kathleen.robeson@usdoj.gov